## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
### EASTERN DISTRICT OF TENNESSEE

In re

Case No. 03-36769

RICKEY LYNN SUSONG
a/k/a RICK L. SUSONG

Debtor

JAMES GIBBS and wife, SHARON GIBBS

Plaintiffs

v.

Adv. Proc. No. 04-3100

RICKEY LYNN SUSONG
a/k/a RICK L. SUSONG

Defendant

## M E M O R A N D U M

**APPEARANCES:**    STONE & HINDS, P.C.
George F. Legg, Esq.
Janet Edwards, Esq.
Mark E. Brown, Esq.
507 Gay Street, S.W.
Suite 700
Knoxville, Tennessee  37902
Attorneys for Plaintiffs

JOHN P. NEWTON, JR., ESQ.
Post Office Box 2069
Knoxville, Tennessee  37901
Attorney for Defendant/Debtor

**RICHARD STAIR, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

This adversary proceeding is before the court upon the Complaint of James and Sharon Gibbs Objecting to Discharge of the Debtor, Rickey Lynn Susong, a/k/a Rick L. Susong (Complaint) filed on May 21, 2004, objecting to the discharge of the Debtor under 11 U.S.C.A. § 727(a)(2), (3), (4), and/or (5) (West 2004). Alternatively, the Plaintiffs seek a determination of the nondischargeability of a debt under 11 U.S.C.A. § 523(a)(2)(A), (4), and/or (6) (West 2004 & Supp. 2005). Finally, and regardless of whether they prevail under § 727 or § 523, the Plaintiffs request a determination of their damages and a resulting judgment against the Debtor.

The trial was held on May 31, 2005, and June 29, 2005, through July 1, 2005. The record before the court consists of ninety-eight exhibits introduced into evidence and the testimony of the Plaintiffs, the Debtor, Marsha Wilson, the bookkeeper for McCarter Lumber Co., William Richard Price, a certified public accountant, and three expert witnesses, Todd Duncan, Thomas E. Howard, and Burton Webb.

This is a core proceeding. 28 U.S.C.A. § 157(b)(I) and (J) (West 1993).

## I

On November 2, 1999, the Plaintiffs entered into a contract with the Debtor, through his company, Back to Basics, Inc. (Back to Basics),[1] for the construction of a 5,850 square foot log home on the Plaintiffs' property in Sevier County, Tennessee, at a purchase price of $531,442.00 (Contract). *See* TRIAL EX. 3 (Compl. Ex. 1); TRIAL EX. 58; TRIAL EX. 90. The Debtor requested an initial $5,000.00 deposit, which the Plaintiffs paid, and the Debtor opened a construction account in the name of Back to Basics, Inc. Construction Account for Jim and Sharon Gibbs (Construction Account) at the Sevier

---

[1] The Debtor and his former spouse, Connie Susong, were the only officers of Back to Basics.

2

County Bank.  *See* TRIAL EX. 50.  Under the parties' agreement, the Plaintiffs would deposit money into

the account, and the Debtor was authorized to make withdrawals to pay reasonable expenses of

construction.  The Debtor also asked the Plaintiffs to secure a one-year construction loan, as the parties

orally agreed that construction would be completed within one year.  *See* TRIAL EX. 28.  Thereafter, the

Plaintiffs obtained a one-year construction loan with Waterfield Financial Corporation (Waterfield

Financial), which closed in March 2000.

Upon the closing of their construction loan, the Debtor requested that the Plaintiffs deposit

funds for the purchase of the log home package necessary to begin construction of their home.  The

Plaintiffs then arranged for Waterfield Financial to deposit $153,632.95 into the Construction Account.

Of that amount, $136,251.00 represented the cost of the log package, while the remaining $17,381.95

represented start up costs.  As of March 13, 2000, the Construction Account had a balance of

$158,628.95.[2]  Thereafter, between March 13, 2000 and May 2, 2000, the following checks, totaling

$156,000.00, were disbursed from the Construction Account to Back to Basics, leaving a balance of

$819.95:  (1) Check No. 302 in the amount of $20,000.00 on March 13, 2000; (2) Check No. 303 in the

amount of $10,000.00 on March 14, 2000; (3) Check No. 304 in the amount of $20,000.00 on March 23,

2000; (4) Check No. 305 in the amount of $50,000.00 on March 24, 2000; (5) Check No. 306 in the

amount of $3,000.00 on April 20, 2000; (6) Check No. 308 in the amount of $20,000.00 on April 25,

2000; (7) Check No. 309 in the amount of $10,000.00 on April 28, 2000; and (8) Check No. 310 in the

amount of $23,000.00 on May 2, 2000.  *See* TRIAL EX. 50.

---

[2] The bank records reflect that the Construction Account had a balance of $4,996.00 prior to the March 13, 2000
deposit.  A check in the amount of $1,809.00 was written to Zurich Insurance on March 7, 2000, and paid on March 17, 2000,
to obtain insurance on the home as it was being built.  *See* TRIAL EX. 50; TRIAL EX. 51.

Between March 2000 and October 2000, when the Plaintiffs first visited the construction site from their home in Mobile, Alabama, very little progress was made.  The basement slab had been poured, the basement walls were up, and the floor trusses and sub-floor were in the process of being installed.  The log package had not been received, but the Debtor assured the Plaintiffs that the logs would be arriving shortly.  Near the end of November 2000, the Plaintiffs authorized another draw, in the amount of $43,642.40, for partial payments on the termite contract, inspections, building permits, work on the septic system, waterproofing, and sub-floor installation.  No further draws were made against the construction loan from Waterfield Financial.

When the log package had still not arrived at the end of March 2001, despite being given shipment dates of March 6 and March 19 by the Debtor, the Plaintiffs made another trip to Tennessee to inspect the construction site.  The Plaintiffs found that since their October 2000 visit, with the exception of the back patio and garage slabs having been poured, part of the deck having been built, and the completion of the sub-floor installation, no additional work had been done to their home.  Additionally, on this visit, the Plaintiffs noticed that water had accumulated in the basement area, there were cracks in the basement walls, the sub-floor was warped from being exposed to the elements, and there was a major crack in the garage floor.

On April 2, 2001, the Plaintiffs met with the Debtor and Connie Susong in order to express their concerns about the cracks and other problems with the house and to establish a time-line for delivery of the log package and completion of the house.[3]  The Debtor expressed little concern about the cracks.  He also assured the Plaintiffs that the first shipment of the log package would be delivered

---

[3] Additionally, at this time, the Plaintiffs presented the Debtor and Connie Susong with an agreement requiring them to pay the additional penalty interest that the Plaintiffs were incurring on their construction loan, due to the extension of the original one-year term.  This agreement was executed by all of the parties.  TRIAL EX. 30.

to his office on April 5, 2001, with the second installment due on April 6, 2001. Once the Plaintiffs

confirmed that the first shipment had arrived, they returned to Alabama. On April 12, 2001, the Debtor

advised the Plaintiffs that he was finished dove-tailing the logs, which he would be delivering to their

property site; however, the Debtor then went out of town, and the Plaintiffs were advised by the

construction foreman, later in April, that the logs were still at Back to Basic's lumber yard.

On May 8, 2001, approximately eighteen months after contracting with the Debtor, the Plaintiffs

sent written notification to Back to Basics, demanding that all construction on the home be

discontinued. TRIAL EX. 31. The Plaintiffs returned to the construction site in mid-May, took pictures

of the problem areas, and began searching for another builder to finish the home. At that time, the

Plaintiffs discovered that the first shipment of logs was stacked on top of the plywood flooring, but

none of the timber beams, roof or porch beams, or stairs had been received.

Due to their concern about the cracks in the walls and floors, the Plaintiffs hired Todd Duncan,

a structural engineer, to evaluate the existing structure to see if it could be repaired. Mr. Duncan visited

the site on June 11, 2001, noting that

> At the time of our visit the first level of logs were installed along the front and right end
> of the building. Several stacks of logs were resting on the main level floor and on the
> ground in front of the structure. . . . On the day of our visit, the temperature was in the
> eighties, it was sunny and there had been no rain for three days.

TRIAL EX. 6. Mr. Duncan also found many problems with the construction.

First, with respect to the basement level, Mr. Duncan observed that the front masonry wall was

bowing and had suffered horizontal movement of nearly one inch, which led to cracking. He testified

that if the wall had been left untreated, the walls constructed above the basement would crack, and

doors would not open or shut properly. Mr. Duncan also found that, as a result of being insufficiently

covered or protected, rain water had pooled in the basement, causing the load-bearing studs to curl.

Additionally, Mr. Duncan testified that the basement walls did not contain adequate steel to support

such a large home, and because of the inadequate support, along with water buildup in the backfill

material, the access wall could not handle the stress.  Similarly, Mr. Duncan stated that one steel lintel

beam over the game room was not anchored or reinforced below, and a second beam was not in a level

position.  Left as is, he concluded that as the beams became loaded during construction, the wall below

would most likely be crushed.

Second, with respect to the main floor level, Mr. Duncan testified that because the framing had

been exposed to the elements for approximately nine months, mold and bacteria were growing on the

boards, which were also swelling and separating.  Mr. Duncan also found that the plywood floor

sheathing was deflecting at the center and was curling, due to the water buildup along with the weight

of the logs stacked thereon.  He stated that because plywood can deteriorate within thirty to forty-five

days, it must be protected from the elements by protective materials.

Third, with respect to the garage and driveway area, Mr. Duncan testified that there were no

reinforcements on top of the wall, and it was not braced.  Because the foundation was narrow, without

restraints at the top, he testified that the wall could fall.  Similarly, the foundation for the retaining wall

for the driveway was too narrow, and without large reinforcement bars in every cell, it too could fall

over time.  Finally, Mr. Duncan found that the sole plate on top of the garage wall did not meet code

requirements for bolts, which would cause the wood plate to bend or crack and the logs to fall to the

ground.

Pursuant to his report dated July 5, 2001, Mr. Duncan made the following recommendations

for remedying the above problems:  (1) reinforce the basement masonry wall from the inside with steel

6

bracing, to be concealed with wood studs; (2) replace all curled studs found in the load bearing wall framing along with all sole plates near the area where water pooled; (3) correct the bearing for the steel lintel beams, including proper anchoring, filling, and reinforcement of the masonry cells; (4) replace all of the main level plywood flooring and possibly all Wood-I-Beam floor joists, if recommended by the manufacturer, but in any event, the joists should be removed and reset to level the flooring; (5) clean all logs present on the site to remove the mold and discolor; (6) check the elevation of all structural beams and columns supporting the main level flooring; (7) properly anchor, grout, and reinforce the load bearing steel support beams; (8) fill, cover, and repair the rear garage wall; and (9) better position the sole plate on the rear garage wall and directly connect the logs to the wall.  TRIAL EX. 6; *see also* TRIAL EX. 7 (photographs taken by Mr. Duncan during his June 2001 inspection of the construction site).

In August 2001, the Plaintiffs hired Tennessee Log Homes, through its president, Burton Webb, to repair and complete the construction of their home.  Tennessee Log Homes contacted Thomas E. Howard, a civil engineer, to examine the basement wall and to make his recommendations.  Mr. Howard testified that the wall, as it existed, would not have supported the structure, and it either had to be repaired or replaced, with repair being the most economical.  To do so, Mr. Howard designed a reinforced twelve inch concrete wall with larger steel bars, spaced at twelve inches on center, and with two buttresses for additional support.  Additionally, to conceal the repairs, Mr. Howard designed a wood wall built twelve inches from the repaired wall, anchored by steel, with concrete poured in between the two walls.  *See generally* TRIAL EX. 10; TRIAL EX. 11.  Mr. Howard's other recommendations included tearing out the old floor and repairing all slabs.  Accordingly, Mr. Webb testified that his crews raised and poured a new garage floor slab, since the existing floor had sunk and cracked beyond repair and

7

extended the wall under the master bedroom to stabilize the main level perimeter walls and secure girder beams.

Prior to completing construction of the Plaintiffs' home, Mr. Webb visited the construction site to inspect the logs provided by the Debtor in the event they could be salvaged and used by Tennessee Log Homes. Mr. Webb testified that the timbers were not graded and were sub-par to those used by Tennessee Log Homes. Additionally, due to their exposure to the elements, many were damaged. Moreover, Mr. Webb testified that there simply were not enough logs to build the home, in that none of the roof beams, structural beams, porch beams, or stairs were on site. Mr. Webb contacted the Debtor on at least one occasion in an attempt to find the remaining logs, but when their location could not be ascertained, Mr. Webb assisted the Plaintiffs in selling the logs located on their property and in purchasing a new log package through Tennessee Log Homes.[4] The Plaintiffs' home was completed prior to the December 1, 2002 deadline set forth in the Construction Management Agreement between the Plaintiffs and Tennessee Log Homes for a final construction price of $598,517.00. *See* TRIAL EX. 15; TRIAL EX. 17.[5] When factoring in the costs of repairs to the existing structure, the Plaintiffs' grand total for completion of their home was $613,643.77. *See* TRIAL EX. 20.

On March 1, 2002, the Plaintiffs filed suit against the Debtor in the Chancery Court for Sevier County, Tennessee (State Court Lawsuit), alleging breach of contract, fraud, and violations of the Tennessee Consumer Protection Act. *See* TRIAL EX. 3; TRIAL EX. 87 (Amended Complaint). The

---

[4] The Plaintiffs received $10,000.00 for the logs present on their property at the time they issued the stop-work order to the Debtor. *See* TRIAL EX. 33. The Plaintiffs purchased the new log package from Tennessee Log Homes for $208,482.68, inclusive of sales tax and a shingles promotional discount. *See* TRIAL EX. 14.

[5] Mr. Webb testified that Tennessee Log Homes did use the existing foundation, slabs, and decks, after making the necessary repairs.

8

Chancellor referred the State Court Lawsuit to a special master, and a hearing was scheduled for December 12, 2003. On that date, the Plaintiffs appeared before the special master to present proof of their damages, but the Debtor did not appear. Instead, on December 12, 2003, the Debtor filed the Voluntary Petition commencing his bankruptcy case under Chapter 7 of the Bankruptcy Code. On April 7, 2004, the Plaintiffs deposed the Debtor pursuant to Federal Rule of Bankruptcy Procedure 2004[6] (2004 Exam), requesting information concerning his financial affairs. The Debtor was also asked to produce several "late-filed" exhibits that he failed to produce at the 2004 Exam.

The Plaintiffs filed the Complaint initiating this adversary proceeding on May 21, 2004, averring that the Debtor, with the intent to hinder and defraud his creditors, did not fully disclose property of the estate, that he has concealed and failed to produce records, books, and documents, that he knowingly and fraudulently made false statements in his Statement of Financial Affairs and schedules and at the 2004 Exam, and that he failed to satisfactorily explain how he has liabilities totaling $1,065,745.70 compared to assets of $29,050.00. Additionally, the Plaintiffs contend that the Debtor knowingly, intentionally, and fraudulently misrepresented to the Plaintiffs that he needed $153,632.95 to begin construction on their home, which would be completed within one year, that he breached a fiduciary duty to the Plaintiffs in connection with the Construction Account, that he intentionally, willfully, and maliciously converted their funds for his own use, including payment of obligations on

---

[6] Rule 2004 provides, in material part, that any party in interest may request to examine any entity, including a debtor, but the scope is limited "relat[ing] only to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge." FED. R. BANKR. P. 2004. "Rule 2004 has been termed 'the basic discovery device used in bankruptcy cases,' permitting the examination of any party without the requirement of a pending adversary proceeding or contested matter." *In re Symington*, 209 B.R. 678, 683 (Bankr. D. Md. 1997). It allows for the deposition examination of the debtor and/or any entity related to the debtor in a sort of "fishing expedition" into the general matters affecting administration of the estate. *In re Dinubilo*, 177 B.R. 932, 939-40 (E.D. Cal. 1993).

other construction jobs, and that he intentionally, willfully, and maliciously injured their property by constructing a portion of the home that was defective.

II

Chapter 7 debtors receive a general discharge of all pre-petition debts under 11 U.S.C.A. § 727, unless one of ten express limitations exists.[7] As material to this adversary proceeding, § 727 provides:

> (a)  The court shall grant the debtor a discharge, unless—
>
> . . . .
>
> > (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
> >
> > > (A) property of the debtor, within one year before the date of the filing of the petition; or
> > >
> > > (B) property of the estate, after the date of the filing of the petition;
> >
> > (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;
> >
> > (4) the debtor knowing and fraudulently, in or in connection with the case—
> >
> > > (A) made a false oath or account; [or]
> > >
> > > . . . .

---

[7]  Chapter 7 discharge relieves "honest but unfortunate" debtors of their debts and allows them a "fresh start" through this discharge. *Buckeye Retirement, LLC v. Heil (In re Heil)*, 289 B.R. 897, 901 (Bankr. E.D. Tenn. 2003) (quoting *In re Krohn*, 886 F.2d 123, 125 (6th Cir. 1989) (citing *Local Loan Co. v. Hunt*, 54 S. Ct. 695, 699 (1934)).

10

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities[.]

. . . .

(b)  Except as provided in section 523 of this title, a discharge under subsection (a) of this section discharges the debtor from all debts that arose before the date of the order for relief under this chapter[.]

11 U.S.C.A. § 727(a).  These limitations furnish creditors with "a vehicle under which *abusive* debtor conduct can be dealt with by denial of discharge."  *Blockman v. Becker (In re Becker)*, 74 B.R. 233, 236 (Bankr. E.D. Tenn. 1987) (quoting *Harman v. Brown (In re Brown)*, 56 B.R. 63, 66 (Bankr. D.N.H. 1985)). Section 727(a) is liberally construed in favor of the debtor, and the party objecting to discharge bears the burden of proof by a preponderance of the evidence.  *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 683 (6th Cir. 2000); *Barclays/Am. Bus. Credit, Inc. v. Adams (In re Adams)*, 31 F.3d 389, 393 (6th Cir. 1994); FED. R. BANKR. P. 4005.

## A

The Plaintiffs' threshold argument is that the Debtor should be denied his discharge by virtue of § 727(a)(4)(A).  To satisfy this subsection, the Plaintiffs must prove:  (1) the Debtor made a statement under oath; (2) that was false; (3) he knew that the statement was false when he made it; (4) he fraudulently intended to make the statement; and (5) the statement materially related to the bankruptcy case.  11 U.S.C.A. § 727(a)(4)(A); *Keeney*, 227 F.3d at 685; *Hendon v. Oody (In re Oody)*, 249 B.R. 482, 487 (Bankr. E.D. Tenn. 2000).  Section 727(a)(4)(A) includes both affirmative false statements and omissions.  *Searles v. Riley (In re Searles)*, 317 B.R. 368, 377 (B.A.P. 9th Cir. 2004).  Furthermore, statements are material for the purposes of § 727(a)(4) if they "bear[] a relationship to the [debtor's] business transactions or estate, or concern[] the discovery of assets, business dealings, or the existence

11

and disposition of property." *Keeney*, 227 F.3d at 686 (quoting *Beaubouef v. Beaubouef (In re Beaubouef)*, 966

F.2d 174, 178 (5th Cir. 1992)).

A debtor's statements and schedules are executed under oath and penalty of perjury. FED. R.

BANKR. P. 1008; OFFICIAL FORM 1 (Voluntary Petition); OFFICIAL FORM 7 (Statement of Financial

Affairs); *Hamo v. Wilson (In re Hamo)*, 233 B.R. 718, 725 (B.A.P. 6th Cir. 1999).  Statements made by the

Debtor at his meeting of creditors pursuant to 11 U.S.C.A. § 341 (West 2004) were made under oath.

*See* 11 U.S.C.A. § 343 (West 2004) ("The debtor shall appear and submit to examination under oath at

the meeting of creditors under section 341(a) of this title. . . ."); FED. R. BANKR. P. 2003(c).  Similarly,

testimony and statements given in his various depositions and his 2004 examination were under oath.

*See, e.g., Brumley v. Wingard*, 269 F.3d 629, 642 (6th Cir. 2001).

Knowledge that a statement is false can be evidenced by a demonstration that the debtor "knew

the truth, but nonetheless failed to give the information or gave contradictory information." *Hamo*, 233

B.R. at 725; *Hunter v. Sowers (In re Sowers)*, 229 B.R. 151, 158 (Bankr. N.D. Ohio 1998) (citing *Pigott v.

Cline (In re Cline)*, 48 B.R. 581, 584 (Bankr. E.D. Tenn. 1985)).  Fraudulent intent "involves a material

representation that [the debtor knows] to be false, or . . . an omission that [the debtor knows] will create

an erroneous impression." *Keeney*, 227 F.3d at 685 (quoting *In re Chavin*, 150 F.3d 726, 728 (7th Cir.

1998)).  Reckless disregard or indifference for the truth also demonstrates fraudulent intent. *Keeney*, 227

F.3d at 686; *Beaubouef*, 966 F.2d at 178.  Likewise, intent may be inferred from the Debtor's conduct, and

a continuing pattern of omissions and/or false statements in his bankruptcy schedules exhibits reckless

indifference. *Hamo*, 233 B.R. at 724-25; *Sowers*, 229 B.R. at 159.  On the other hand, courts do not

generally find that debtors who mistakenly or inadvertently give false information, and those who amend

their schedules and report omissions or misstatements prior to or during their meetings of creditors

12

possess the requisite fraudulent intent for denial of their discharge under § 727(a)(4)(A). *Keeney*, 227 F.3d at 686; *Gold v. Guttman (In re Guttman)*, 237 B.R. 643, 647 (Bankr. E.D. Mich. 1999).

Here, the Plaintiffs' objection to the Debtor's discharge under § 727(a)(4)(A) is grounded on their contention that he filed statements and schedules that were materially inaccurate and false when he (1) intentionally omitted his ownership interest in and income received from a Tennessee limited liability company, Mountain Top Development, LLC (Mountain Top Development); (2) failed to disclose income received in 2003 from Only Specs, Inc. (Only Specs), a company owned by the Debtor; (3) did not disclose two former addresses; and (4) incorrectly listed the closing dates for Only Specs and Lots Inc., another company owned by the Debtor.  The Plaintiffs also argue that the Debtor gave false or misleading testimony at his 2004 Exam and subsequent depositions.

The Plaintiffs' argument centers around the Debtor's failure to disclose in his statements and schedules an ownership interest in, along with a significant amount of income received from, Mountain Top Development, together with his conflicting testimony regarding the same.  In response, the Debtor maintains that he did not list Mountain Top Development because, at the time he filed his bankruptcy case, he believed he was only the managing member, but not its owner.  The Debtor's testimony with respect to this issue has varied over the course of this litigation.  For example, in his 2004 Exam, the Debtor testified that both of his parents started Mountain Top Development, and it was later transferred to his son, Derrick, in either 2002 or 2003.  Then, at trial, the Debtor testified that he personally met with his former attorney, Charles Kite, to set up the company in his mother's name, and that they discussed transferring it to Derrick in 2003.  Mr. Kite's notes from their June 2002 meeting, however, evidence that the Debtor was to be the 100% owner of the company, and accordingly, Mountain Top Development's Articles of Organization, its Operating Agreement, and the Minutes of

13

the first meeting, all three dated June 28, 2002, evidence that the Debtor is the one and only manager and member of the company.  *See* TRIAL EX. 93; TRIAL EX. 95; TRIAL EX. 97.[8]  These documents were signed by the Debtor, who is charged with the knowledge of the information contained therein, even if he did not, as he testified, expressly read every word.[9]

Also at issue is whether the Debtor failed to disclose income received from Mountain Top Development.  Mountain Top Development's bank records indicate that the Debtor received funds from Mountain Top Development between November 2002 and December 12, 2003,[10] broken down as follows:  (1) in November 2002, the Debtor wrote checks to himself totaling $17,000.00 and transferred $4,000.00 to his personal account on November 6, 2002; (2) in December 2002, the Debtor wrote checks to himself totaling $2,800.00; (3) in March 2003, the Debtor wrote checks to himself totaling $700.00; (4) in April 2003, the Debtor wrote checks to himself totaling $1,700.00; (5) in May 2003, the Debtor wrote checks to himself totaling $4,500.00; (6) in June 2003, the Debtor wrote checks to himself totaling $3,500.00; (7) in July 2003, the Debtor wrote checks totaling $4,000.00 to himself; (8) in August 2003, the Debtor wrote checks to himself in the total amount of $4,500.00; (9) in September 2003, the Debtor wrote checks to himself in the total amount of $3,200.00; (10) in October 2003, the Debtor wrote checks to himself totaling $6,200.00.  TRIAL EX. 82.

---

[8] The court further notes that the Application for Employer Identification Number for Mountain Top Development lists the Debtor as the "principal officer, general partner, grantor, owner, or trustor," along with the Debtor's social security number.

[9] *See Haney v. Copeland (In re Copeland)*, 291 B.R. 749, 789 (Bankr. E.D. Tenn. 2003) (finding a debtor's failure to read a false tax return and sales tax affidavit rose to the level of gross recklessness); *Solomon v. First Am. Nat'l Bank*, 774 S.W.2d 935, 943 (Tenn. Ct. App. 1989) ("Ordinarily, one having the ability and opportunity to inform himself of the contents of a writing before he executes it will not be allowed to avoid it by showing that he was ignorant of its contents or that he failed to read it.").

[10] The Debtor did not produce the bank statement for February 2003.  A significant portion of the October 2003 bank statement, with respect to twenty-four cancelled checks totaling $33,863.85, was not produced by the Debtor. Additionally, the Debtor did not produce the November 2003 or December 2003 bank statements.

The Debtor also wrote various checks out of the Mountain Top Development account that appear to be personal in nature. First, the Debtor wrote checks in the aggregate amount of $5,000.00 to his former girlfriend, Kelli Anderson, as follows: (1) $500.00 in November 2002; (2) $800.00 in April 2003; (3) in May 2003, totaling $1,200.00; (4) in June 2003, totaling $1,500.00; and (5) in July 2003, totaling $1,000.00. TRIAL EX. 82. He also made two payments, in November and December 2002, in the aggregate amount of $4,775.00, to Ted Jordan, who the Debtor acknowledged was renting him a place to live as well as a storage facility. TRIAL EX. 82.

The Debtor also wrote checks to Walgreens: (1) totaling $376.28 in November 2002; (2) totaling $303.50 in June 2003; (3) totaling $261.07 in July 2003; (4) totaling $409.99 in August 2003; (5) totaling $185.97 in September 2003; (6) $94.99 in October 2003; and (7) $76.79 on December 3, 2003, and to Hatchers Cleaners as follows: (1) $66.52 in June 2003; (2) $47.42 in July 2003; (3) $50.21 in August 2003; and (4) totaling $114.98 in September 2003. TRIAL EX. 82. The Debtor wrote checks to Pigeon Forge Medical in December 2002 for $30.00 and in June 2003 for $15.00, and he wrote two checks to Ford Motor Credit in August and September 2003, each for $381.34. TRIAL EX. 82. Additionally, on December 16, 2002, the Debtor wrote a check in the amount of $115.00 to The Dental Center, on May 28, 2003, he wrote a check to a family member in the amount of $400.00[11] and on December 17, 2003, he wrote a check to Ideal Auto Sales for $1,500.00, which he acknowledged at trial was for the purchase of a Jeep for his son, Derrick. TRIAL EX. 82. All of the checks written out of the Mountain Top Development account were signed by the Debtor, who disputed the nature of these payments as

---

[11] Check number 1191, which cleared on May 28, 2003, is illegible as to the first name of the payor; however, it is clear that the last name is "Susong." *See* TRIAL EX. 82.

income, claiming that he used these funds to purchase equipment and to reimburse himself for payments that he personally made for the benefit of the company.

Finally, the Debtor made the following withdrawals from the Mountain Top Development account that he was unable to explain:  (1) $3,410.00 on November 4, 2002; (2) $1,748.12 on December 17, 2002; (3) on December 20, 2002, two separate withdrawals of $325.00 and $2,300.00, along with a check payable to "cash" in the amount of $3,000.00; (4) $4,800.00 on December 31, 2002; (5) $2,545.00 on January 10, 2003; (6) on March 6, 2003, a transfer of $1,500.00 to another account with Mountain National Bank; (7) a second transfer in the amount of $3,000.00 to the same account on March 7, 2003; (8) $7,089.87 on May 5, 2003; (9) $200.00 on July 21, 2003; (10) $500.00 on August 27, 2003; and (11) $1,000.00 on September 12, 2003.  TRIAL EX. 82.  These withdrawals total $31,417.99.

With respect to Only Specs, the Debtor received funds in the amount of $10,770.97, evidenced by the following activity: (1) in January 2003, the Debtor withdrew $3,900.00 from the account; (2) in February 2003, the Debtor wrote a check to himself in the amount of $270.00 and withdrew $6,100.97; and (3) in March 2003, the Debtor wrote a check to himself in the amount of $500.00.[12] TRIAL EX. 84. The Debtor testified that he can not recall how these withdrawals were spent, nor did he present documentation to evidence what these funds were for or how they were spent.

Section 727(a) is to be strictly construed in favor of the Debtor; however, his contention that he did not know that he owned Mountain Top Development at the time he filed his bankruptcy case, but instead, was only its managing member is not believable and is not supported by the record before the court. At trial, the Debtor testified that he did not understand the difference between being an officer and being an owner of a limited liability company, such as Mountain Top Development. While Mr. Kite's notes show that the Debtor's mother was to be an officer of Mountain Top Development, *see* TRIAL EX. 95; TRIAL EX. 97, the proof conclusively establishes that the Debtor was the owner, sole operator, and managing member of Mountain Top Development. Again, his testimony that he was unaware of his ownership interest is not credible.

Clearly, the Debtor failed to disclose his interest in Mountain Top Development. Question 18a of his Statement of Financial Affairs expressly states:

> If the debtor is an individual, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partnership, sole proprietorship, or was a self-employed professional within the six years

---

[12] Significant portions of the Only Specs bank records for all three months were not produced, and some of those produced are illegible, so the foregoing amounts could be higher. At trial, the Debtor acknowledged that canceled checks totaling $27,439.73 are missing from the February 2003 statement, canceled checks totaling $12,743.10 are missing from the March 2003 statement, and canceled checks totaling $950.00 are missing from the April 2003 statement.

immediately preceding the commencement of this case, or in which the debtor owned
5 percent or more of the voting or equity securities within the six years immediately
preceding the commencement of this case.

TRIAL EX. 88.  In response to this question, the Debtor listed the following companies that he had

owned or served as an officer for: (1) Back to Basics from January 1996 through December 2001; (2)

Lots Inc. from January 1996 through September 2001; (3) Only Specs from February 2002 through

December 2002; (4) Ridgeview Developments from January 1995 through September 2002; and (5)

Volunteer Cabin Rentals from July 1998 through January 2001.  TRIAL EX. 88.

Irrespective of the veracity of the Debtor's assertions that he did not list Mountain Top

Development because he did not believe that he owned it, the Debtor's failure to list Mountain Top

Development in his Statement of Financial Affairs constitutes a false oath and justifies denial of his

discharge pursuant to § 727(a)(4)(A).  The question expressly asks for disclosure of any company in

which the Debtor was an officer or a managing executive.  Assuming, *arguendo*, that the Debtor truly was

unaware that he actually owned Mountain Top Development, he clearly acknowledged, both in his

testimony at trial and in various documents executed on behalf of Mountain Top Development, that

he was the managing member of the company.  *See, e.g.*, TRIAL EX. 62; TRIAL EX. 63; TRIAL EX. 64;

TRIAL EX. 65; TRIAL EX. 69; TRIAL EX. 70; TRIAL EX. 72; TRIAL EX. 73; TRIAL EX. 75 (executed as

"Chief Manager"); TRIAL EX. 94.[13]  The Debtor was required to disclose his position as "managing

member" of Mountain Top Development in his Statement of Financial Affairs.

Additionally, the court finds that he failed to disclose income received in both 2002 and 2003

from Mountain Top Development and in 2003 from Only Specs.  In his Statement of Financial Affairs,

---

[13] It also appears that the Debtor executed at least two documents as "President" of Mountain Top Development.
*See* TRIAL EX. 71; TRIAL EX. 72.

the Debtor listed an estimated income from self-employment of $35,000.00 for both 2002 and 2003. TRIAL EX. 88. Based upon the checks and transfers made directly to himself, as detailed above, the Debtor paid himself from Mountain Top Development $23,800.00 just in November and December 2002. For those months ascertainable in 2003, the Debtor paid himself $28,300.00 from Mountain Top Development and $770.00 from Only Specs, resulting in $29,070.00 in draws or income received from these two companies in 2003. These figures, alone, fall in line with the Debtor's estimated $35,000.00.

Nevertheless, the inquiry cannot end there. Not withstanding that many records were not produced and could not be analyzed,[14] the evidence shows that, in 2002, the Debtor withdrew $15,583.12 from the Mountain Top Development account, again, during the months of November and December. In 2003, the Debtor withdrew $15,834.70 from the Mountain Top Development account and $10,000.97 from the Only Specs account. Combining those amounts with the Debtor's "paychecks" from each company, the Debtor received $39,383.12 from Mountain Top Development in the final two months of 2002, and a total of $54,905.84 from Mountain Top Development and Only Specs in 2003. These figures are more than the estimated income for both 2002 and 2003, as stated by the Debtor in his Statement of Financial Affairs.

Furthermore, with respect to the Walgreens checks, totaling $376.28 in 2002, and $1,332.31 in 2003, the Debtor acknowledged at trial that he was not sure, but he probably did pay for personal items with those checks, including prescriptions. The Debtor also wrote a $115.00 check to The Dental Center, checks totaling $279.13 to Hatchers Cleaners, checks totaling $45.00 to Pigeon Forge Medical, and he admitted purchasing a $1,500.00 vehicle for his son through Mountain Top Development. Although during those same months, the bank records evidence payments to Blalocks, Lowe's, and

---

[14] *See supra* notes 10 and 12.

Home Depot, being as the Debtor was in the construction business, it can be reasonably presumed that the checks to those retailers were business expenditures, paying for supplies or materials. The same cannot be said for checks written to Walgreens, Hatchers Cleaners, and Ideal Auto Sales.

Finally, with respect to the payments to Ms. Anderson, the Debtor testified that he had purchased a truck from her that he used for work. Correspondingly, the Debtor listed a debt to Ms. Anderson for a 1996 Dodge 1500 4x4 truck in his Schedule F, and he listed a monthly payment of $350.00 to Ms. Anderson for a "work truck" in his Schedule J. TRIAL EX. 83. However, the payments made to Ms. Anderson in 2003, totaling $4,500.00, were sporadic, at best, and actually reflect payment of $300.00 more than the monthly amount the Debtor scheduled in his budget. At trial, the Debtor also stated that he was paying Ms. Anderson's monthly rent of $1,000.00 for her; however, the amounts paid to Ms. Anderson do not jive with the Debtor's testimony with respect to also paying her rent, again, contradicting the evidence and raising questions with respect to the Debtor's truthfulness.

In short, counting all checks and withdrawals described in detail above, less the estimated $35,000.00 actually listed in his Statement of Financial Affairs, the Debtor received an undisclosed benefit, in the form of payments for personal expenses, of at least $10,179.40 in 2002, and $28,694.96 in 2003. Once again, the figures for 2002 only reflect November and December of that year, and the figures for 2003 do not include any transactions from February, much of October, November, or December with respect to Mountain Top Development, or a large portion of the Only Specs transactions for February, March, and April. Taking all of the evidence together, the court finds that the Debtor made a false oath in his Statement of Financial Affairs by failing to list the additional income derived from both Mountain Top Development and Only Specs in 2002 and 2003.

The Plaintiffs also established that the Debtor listed incorrect ending dates for the business operations of Only Specs and Lots Inc. in his Statement of Financial Affairs. With respect to Only Specs, the Debtor listed a beginning date of February 1, 2002, and an ending date of December 1, 2002; however, the bank records for Mountain Top Development evidence that checks were paid to Only Specs totaling $3,500.00 in March 2003, and totaling $1,500.00 in April 2003. TRIAL EX. 82. Likewise, the bank statements for Only Specs evidence the following account transactions occurred after December 2002: (1) for January 2003, deposits of $25,597.39 and debits of $20,575.23; (2) for February 2003, deposits of $57,674.41 and debits of $56,805.72; (3) for March 2003, deposits of $16,948.44 and debits of $26,855.81; and (4) for April 2003, deposits of $15,070.97 and debits of $11,618.12. TRIAL EX. 84. The account was then closed in July 2003.

With respect to Lots Inc., the Debtor listed a beginning date of January 1, 1996, and an ending date of September 1, 2001. However, Lots Inc. made several transfers of property after that date. On June 3, 2002, Lots Inc. sold Lot 3 of Dogwood Farms Subdivision, Phase VI, to Darvin and Carolyn Hoffman for $70,000.00. TRIAL EX. 76. On August 22, 2002, Lots Inc. sold Lots 36 and 37 of Dogwood Farms Subdivision, Phase III, to HKH Ventures, Inc., for $260,000.00. TRIAL EX. 78. On September 9, 2002, Lots Inc. sold Lot 6 of Dogwood Farms Subdivision, Phase VI, to Wynn and Toni Harvey for $62,000.00. TRIAL EX. 80. On October 11, 2002, Lots Inc. sold Lot 1 of Dogwood Farms Subdivision, Phase IV, to the Carol Register Family Trust for $75,000.00. TRIAL EX. 81. On November 26, 2002, Lots Inc. sold Lots 5, 11, 14, 16, 17, 18, 19, 20, and 21 of Dogwood Farms Subdivision, Phase VI, to Mountain Top Development for $100,000.00. TRIAL EX. 61. When questioned about these discrepancies at trial, the Debtor responded that the various transactions wound up old deals for each company. Specifically addressing the question with respect to Lots Inc., the Debtor stated that the

21

company had ceased buying any new property as of September 2001, despite the fact that it closed sales more than one year later.

Once again, the court finds that the Debtor made a false oath in connection with the listed ending dates of these two companies, justifying denial of his discharge pursuant to § 727(a)(4)(A). Despite the Debtor's contention in his Statement of Financial Affairs that Only Specs ceased doing business in December 2002, the evidence establishes that between January and April 2003, many transactions occurred, not to mention the fact that the only records produced by the Debtor with respect to Only Specs were its bank records for January 2003 through July 2003. *See* TRIAL EX. 84. Similarly, the Debtor's Statement of Financial Affairs lists Lots Inc.'s ending date as September 2001; however, the evidence establishes that Lots Inc. closed at least five sales of property between June and November 2002. The Debtor's explanation that these companies were winding up is simply not supported by the evidence presented.

Significantly, the Debtor acknowledged at trial that he has never amended his statements and schedules. His failure to amend, whether immediately upon discovering the incorrect listings, or any time thereafter, is likewise fatal to his defense. Accordingly, based upon the evidence presented, the Plaintiffs have met their burden of proof that the Debtor made false statements, and his discharge will be denied pursuant to § 727(a)(4)(A).

**B**

The Plaintiffs have also objected to the Debtor's discharge under § 727(a)(3) for failing to produce documentation "with enough information to ascertain [his] financial condition and track [his] financial dealings with substantial accuracy for a reasonable period past to present." *Wazeter v. Mich.*

22

*Nat'l Bank (In re Wazeter)*, 209 B.R. 222, 227 (W.D. Mich. 1997) (quoting *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996) (citations omitted)). This disclosure provides the trustee and creditors with sufficient information concerning the Debtor's financial history and current financial affairs, because "[c]reditors are not required to risk having the debtor withhold or conceal assets 'under the cover of a chaotic or incomplete set of books or records.'" *Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir. 1992) (quoting *Cox v. Lansdowne (In re Cox)*, 904 F.2d 1399, 1401 (9th Cir. 1990)).

Accordingly, the Plaintiffs are not required to investigate and acquire the Debtor's records, as it is the Debtor's responsibility to provide sufficient information. *See Wazeter*, 209 B.R. at 227-28 (citing *Juzwiak*, 89 F.3d at 428). The Plaintiffs do, however, bear the initial burden of proof under § 727(a)(3) that the Debtor "has failed to maintain adequate books and records and that such failure renders it impossible to discern [his] true financial condition[.]" *Christy v. Kowalski (In re Kowalski)*, 316 B.R. 596, 601 (Bankr. E.D.N.Y. 2004). If the Plaintiffs prove that the Debtor's records are inadequate, the burden shifts to the Debtor to prove that his failure to maintain records was justified under the specific circumstances of his case. *Turoczy Bonding Co. v. Strbac (In re Strbac)*, 235 B.R. 880, 883 (B.A.P. 6th Cir. 1999). Intent is not an element under § 727(a)(3). *Union Planters Bank, N.A. v. Connors*, 283 F.3d 896, 901 (7th Cir. 2002).

The adequacy of a debtor's records is determined on a case by case basis, *Strbac*, 235 B.R. at 882, and judges have broad discretion to deny discharge based on inadequately kept books and records. *Dolin v. N. Petrochemical Co. (In re Dolin)*, 799 F.2d 251, 253 (6th Cir. 1986).

> The Bankruptcy Code does not require a debtor seeking a discharge specifically to maintain a bank account, nor does it require an impeccable system of bookkeeping. Nevertheless, the records must "'sufficiently identify the transactions [so] that intelligent inquiry can be made of them.' The test is whether 'there [is] available written evidence made and preserved from which the present financial condition of the bankrupt, and his business transactions for a reasonable period in the past may be ascertained.'"

*Alten*, 958 F.2d at 1230 (quoting *In re Decker*, 595 F.2d 185, 187 (3d Cir. 1979) (citations omitted)).

Instead, the Debtor's records should be measured "against the type of books and records kept by a

reasonably prudent debtor with the same occupation, financial structure, education, and experience."

*Wazeter*, 209 B.R. at 227 (quoting *Wynn v. Wynn (In re Wynn)*, 205 B.R. 97, 101 (Bankr. N.D. Ohio 1997)).

> Other factors focused on by courts include:
>
> 1. Whether the debtor was engaged in business, and if so, the complexity and volume of the business;
>
> 2. The amount of the debtor's obligations;
>
> 3. Whether the debtor's failure to keep or preserve books and records was due to the debtor's fault;
>
> 4. The debtor's education, business experience and sophistication;
>
> 5. The customary business practices for record keeping in the debtor's type of business;
>
> 6. The degree of accuracy disclosed by the debtor's existing books and records;
>
> 7. The extent of any egregious conduct on the debtor's part; and
>
> 8. The debtor's courtroom demeanor.

*Kowalski*, 316 B.R. at 602 (citing *Krohn v. Frommann (In re Frommann)*, 153 B.R. 113, 117 (Bankr.

E.D.N.Y. 1993)).  Examples of inadequate disclosures include the failure to produce checking account

statements, tax returns, household bills and/or credit card records, loan documentation, pay records,

and real estate closing statements.  *See Ochs v. Nemes (In re Nemes)*, 323 B.R. 316, 325 (Bankr. E.D.N.Y.

2005) (credit card records and bank statements); *Strbac*, 235 B.R. at 884 (tax returns, paycheck stubs, and

records with respect to the debtor's subcontractor work); *Wazeter*, 209 B.R. at 228 (cancelled checks for

two years, loan records, closing records for real estate transactions, and household bills).

The Plaintiffs urge the court to deny the Debtor's discharge, based upon his failure to adequately maintain and produce any of his personal financial records along with the records concerning Mountain Top Development, Only Specs, Ridgeview Developments, and Volunteer Cabin Rentals. The Plaintiffs argue that they have repeatedly sought complete bank records for these companies to evidence their respective incomes and expenditures for the year preceding the Debtor's bankruptcy filing. Further, the Plaintiffs argue that it is inexcusable for the Debtor to have produced only one closing statement concerning the multiple transfers of property by Mountain Top Development in the year preceding his bankruptcy filing. Finally, the Plaintiffs maintain that the Debtor has had access to his records, as evidenced by the testimony of his former attorney, Mr. Kite, who stated that he turned over several boxes of records to the Debtor when he closed his law practice in 2004, but the Debtor has failed to produce them. In his defense, the Debtor argued that he has made available all of his financial records, and to the extent available, he has produced the financial records of the various corporations he is involved with, as requested by the Plaintiffs.

In connection with this adversary proceeding, the Plaintiffs served the Debtor with a request for production of documents, which he answered on February 22, 2005, through the Defendant's Response to Plaintiff's [sic] First Set of Requests for Production of Documents to Defendant Rickey Lynn Susong a/k/a Rick L. Susong. *See* TRIAL EX. 54. The production of documents requested, among other things, bank records for Lots Inc., Only Specs, Mountain Top Development, Back to Basics, Ridgeview Developments, and Volunteer Cabin Rentals, asking the Debtor to "[p]roduce any and all bank records, including checking account records, and miscellaneous expense records for two (2) years preceding bankruptcy for each of the [foregoing] companies[,]" to which the Debtor answered "none" with respect to Lots Inc. and Only Specs, "see attached" with respect to Back to Basics and Mountain

25

Top Development, and "none available" with respect to Ridgeview Developments and Volunteer Cabin Rentals.  TRIAL EX. 54.

The Plaintiffs also requested "any and all organizational records and minutes of meetings" for each company, to which the Debtor responded "[f]ile available for inspection and copying" with respect to Mountain Top Development and Back to Basics, and "none available" for Lots Inc., Only Specs, Ridgeview Developments, and Volunteer Cabin Rentals.  TRIAL EX. 54.  Similarly, the Debtor responded that "any and all initial capitalization and membership records" for Only Specs, Mountain Top Development, and Back to Basics were "available for inspection and copying" but there were "none available" for Lots Inc., Ridgeview Developments, and Volunteer Cabin Rentals.  TRIAL EX. 54.  The Debtor also stated that "[n]o other records located except one banker box which is available for inspection and copying which was produced to Plaintiff in State Court Case" with respect to contracts and anything relating to the Plaintiffs' project.  TRIAL EX. 54.  At trial, the Debtor maintained that he had given the Plaintiffs everything that he had in his possession, but that he generally did not maintain copies of documents.

The Debtor did produce some records, including invoices concerning the Plaintiffs' construction.  *See* TRIAL EX. 51.  He also produced bank records for Back to Basics, Mountain Top Development, and Only Specs.  *See* TRIAL EX. 56; TRIAL EX. 82; TRIAL EX. 84.  Additionally, the Debtor produced the corporate records for Mountain Top Development obtained from Mr. Kite.  *See* TRIAL EX. 95; TRIAL EX. 97.  All in all, the Debtor testified that after turning over all records that he had in his possession or those that could be located, he produced more than 700 pages of documentation to the Plaintiffs.

26

As for the remaining records, the Debtor argued that he did not produce any other bank records because it would cost too much to get them; however, at trial, the Debtor acknowledged that, with the exception of finding out those costs,[15] he did not take any steps or make any efforts to obtain the documents that were not produced. Likewise, on various occasions, the Debtor advised the Plaintiffs or their attorneys that documents were in the possession of third parties, such as William Richard Price, his CPA, or Mr. Kite, his attorney. Again, however, the Debtor did not attempt to obtain the records from these third parties. A similar argument was advanced and summarily rejected in *Cadle Co. v. Terrell*, No. 4:01-CV-0399-E, 2001 U.S. Dist. LEXIS 21944, 2002 WL 22075 (N.D. Tex. Jan. 7, 2002), in which the court made the following observations:

> [Terrell] appears to argue that he did not have to produce his credit card records and bank account statements in response to Cadle's discovery requests because these records were in the possession of the credit card companies and his wife's bank, and not in his "actual possession, custody, or control." This argument must be rejected, as Terrell had an obligation to produce any documents requested by Cadle that he had "the legal right to obtain . . . upon demand." *See Cochran Consulting, Inc. v. Uwatec USA, Inc.,* 102 F.3d 1224, 1229-30 (Fed. Cir. 1996); *Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir. 1984). Because Terrell had the legal right to request copies of his statements from the credit card companies, and his wife could obtain records of her account from the bank, Terrell had a duty to disclose the requested information to Cadle. Despite what he may believe, Terrell's creditors were "not required to ferret out" the records necessary to trace his financial history. *United States v. Craig (In re Craig)*, 252 B.R. 822, 828 (Bankr. S.D. Fla. 2000) (quoting *In re Caserta*, 182 B.R. 599, 611 (Bankr. S.D. Fla. 1995)). Terrell has failed to demonstrate that his inability to produce adequate records was justified under the circumstances.

*Terrell*, 2001 U.S. Dist. LEXIS 21944, at *15-16; 2002 WL 22075, at *5. This court agrees with that assessment as it relates to the Debtor.

---

[15] The Debtor testified that he was told it would cost $3.00 per page plus $25.00 per hour to get records from his bank.

Additionally, to rebut the Debtor's contention that his bookkeeper had the invoices or bills concerning their construction, the Plaintiffs relied upon the testimony of the Debtor's former accountant, Mr. Price.  At a prior deposition, the Debtor had testified that Mr. Price had invoices and W-2s for Mountain Top Development, and at trial, the Debtor stated that he gave Mr. Price cancelled checks at the end of each year in order to prepare tax returns, but he did not attempt to get records from Mr. Price because he owed him for past services.  However, when Mr. Price appeared at trial, subject to a subpoena duces tecum, he testified that he did not bring those documents because he did not have any in his possession.  Furthermore, Mr. Price testified that he had the Debtor's tax returns for 1998 through 2002, as well as the 2002 tax return for Mountain Top Development, but he did not prepare any for 2003.

Clearly, the Debtor has failed to produce numerous documents requested by the Plaintiffs.  First, with respect to his various businesses, the records provided by the Debtor were incomplete.  He did not produce any documentation concerning Volunteer Cabin Rentals or Ridgeview Developments.  The Debtor actually produced a few documents concerning Only Specs, along with slightly more documentation concerning Mountain Top Development; however, as previously discussed in considerable detail, these records were incomplete.

Additionally, despite countless requests during the State Court Lawsuit, in his bankruptcy case, and in this adversary proceeding,[16] the Debtor has repeatedly failed to provide the Plaintiffs with any

---

[16] The parties have engaged in several disputes concerning discovery and the Debtor's failure to produce documents requested by the Plaintiffs.  On May 12, 2005, the court entered an Order stating that the Debtor "shall not, at the trial of this adversary, be allowed to introduce into evidence any document in his possession, custody or control that was requested but not produced pursuant to the Plaintiffs' First Set of Request for Production of Documents."  Additionally, in the State Court Lawsuit, an Order was entered on November 12, 2002, finding that the Debtor had failed to respond to interrogatories and a request for production of documents, awarding $1,440.00 in attorneys' fees, striking defenses from the Answer, and prohibiting the introduction of evidence concerning those interrogatories and requests for production not adequately
(continued...)

of his personal bank statements, cancelled checks, pay records, financial statements, or tax returns,

without offering any viable reason for non-production.[17]

The Debtor has failed to produce any personal documentation whatsoever, and he has failed

to produce complete records with respect to his businesses.  Accordingly, the court finds that the

Debtor has not provided sufficient documentation by which his creditors may ascertain his true financial

condition.  As such, the court finds that the Plaintiffs have met their burden of proof and that the

Debtor has not met his burden of proving that his failure to produce adequate documentation was

justified under the circumstances.  The Debtor will also be denied his discharge pursuant to § 727(a)(3).

## C

The Plaintiffs have also objected to the Debtor's discharge under § 727(a)(5), alleging that he

has not adequately explained a loss or deficiency of assets.  The court has "broad power [under

§ 727(a)(5)] to decline to grant a discharge . . . where the debtor does not adequately explain a shortage,

loss, or disappearance of assets."  *In re D'Agnese*, 86 F.3d 732, 734 (7th Cir. 1996).  The initial burden is

on the Plaintiffs to establish the loss or deficiency of assets by demonstrating that (1) at a time not too

remote from the bankruptcy, the Debtor owned identifiable assets; (2) on the day that he commenced

his bankruptcy case, the Debtor no longer owned the particular assets in question; and (3) his schedules

and/or the pleadings in the bankruptcy case do not offer an adequate explanation for the disposition

---

[16](...continued)
answered.  TRIAL EX. 86.

[17] Despite approximately three years of discovery disputes, the Debtor testified, for the first time at trial, that he
had stored several bankers boxes in a storage facility, many of which contained various business and personal records, that
were damaged by water.  Upon cross-examination, the Debtor clarified that he had no actual knowledge as to what
documents were in those lost bankers boxes.  Nonetheless, the Debtor never mentioned any water-damaged boxes in any
of his depositions or in his response to the Plaintiffs' request for production of documents, and the court finds this testimony
to be self-serving, unsubstantiated, and unbelievable.

of the assets in question. *Schilling v. O'Bryan (In re O'Bryan)*, 246 B.R. 271, 279 (Bankr. W.D. Ky. 1999).

The Plaintiffs are not required to prove that the Debtor acted knowingly or fraudulently, as "noticeably

lacking from § 727(a)(5) is any element of wrongful intent or, for that matter, any affirmative defenses --

§ 727(a)(5) simply imposes strict liability." *Baker v. Reed (In re Reed)*, 310 B.R. 363, 368 (Bankr. N.D.

Ohio 2004).[18]

The burden then shifts to the Debtor to provide a satisfactory explanation of the whereabouts

of the assets. *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir. 1984). "[A] satisfactory

explanation 'must consist of more than . . . vague, indefinite, and uncorroborated' assertions by the

debtor," *D'Agnese*, 86 F.3d at 734 (quoting *Baum v. Earl Millikin, Inc. (In re Baum)*, 359 F.2d 811, 814 (7th

Cir. 1966)), and it must be reasonable and credible, such that the court is convinced that the debtor is

acting in good faith. *Fed. Deposit Ins. Corp. v. Hendren (In re Hendren)*, 51 B.R. 781, 788 (Bankr. E.D. Tenn.

1985). Furthermore, the explanation must be supported by "at least some documentation . . . [that is]

sufficient to 'eliminate the need for the Court to speculate as to what happened to all the assets.'"

*Stathopoulos v. Bostrom (In re Bostrom)*, 286 B.R. 352, 364-65 (Bankr. N.D. Ill. 2002) (quoting *Banner Oil Co.

v. Bryson (In re Bryson)*, 187 B.R. 939, 956 (Bankr. N.D. Ill. 1995)); *see also NAFCO Fed. Credit Union v.

Lawson (In re Lawson)*, 308 B.R. 417, 426 (Bankr. D. Neb. 2004) ("**The explanation should be sufficient

so the court does not have to speculate as to what happened to the assets or speculate as to the

veracity of the explanation.**").

---

[18] "By penalizing a debtor who is insufficiently forthcoming about what happened to his assets, section 727(a)(5) is one of several Code provisions meant to 'relieve[] creditors and courts of the full burden of reconstructing the debtor's financial history and condition, placing it instead upon the debtor.'" *Cohen v. Olbur (In re Olbur)*, 314 B.R. 732, 740 (Bankr. N.D. Ill. 2004) (quoting *First Commercial Fin. Group, Inc. v. Hermanson (In re Hermanson)*, 273 B.R. 538, 545 (Bankr. N.D. Ill. 2002)).

The Plaintiffs contend that the Debtor's discharge should be denied under § 727(a)(5) because he failed to offer any explanation with respect to the money he paid to himself and/or withdrew from Mountain Top Development and Only Specs in 2002 and 2003, immediately preceding his bankruptcy filing.  The Plaintiffs bore the initial burden of demonstrating that the Debtor owned identifiable assets at a time not too remote from the bankruptcy, but that when he filed, he no longer owned those assets, and he has not offered an adequate explanation for the disposition of those assets.  *See Schilling v. O'Bryan (In re O'Bryan)*, 246 B.R. 271, 279 (Bankr. W.D. Ky. 1999).  The court has already determined that the Debtor failed to disclose withdrawals and transfers of at least    $41,418.96 from Mountain Top Development and Only Specs in 2002 and 2003, and that, at trial, the Debtor testified he was unaware where or how those funds were spent.  Accordingly, the court finds that the Debtor has failed to offer an adequate explanation as to the disposition of assets in the years immediately preceding his bankruptcy case, and therefore, denial of discharge under § 727(a)(5) is appropriate.

**D**

The Plaintiffs additionally object to the Debtor's discharge under § 727(a)(2)(A), which consists of two elements:  (1) the disposition of property, including transfer or concealment, within one year of filing his bankruptcy petition, and (2) the Debtor's subjective intent to hinder, delay, or defraud creditors by disposing of his property.  *Keeney*, 227 F.3d at 683-84 (citing *Hughes v. Lawson (In re Lawson)*, 122 F.3d 1237, 1240 (9th Cir. 1997)); *see also Cuervo v. Snell (In re Snell)*, 240 B.R. 728, 730 (Bankr. S.D. Ohio 1999) (stating that a plaintiff need not prove the debtor intended to hinder, delay, and defraud creditors, since proof of any one satisfies § 727(a)(2)(A)).

Section 727(a)(2)(A) requires proof of actual fraudulent intent, as constructive fraud will not suffice.  *E. Diversified Distrib., Inc. v. Matus (In re Matus)*, 303 B.R. 660, 672 (Bankr. N.D. Ga. 2004). Accordingly, in order to prevail under this subsection, the Plaintiffs must prove that the Debtor possessed the intent to deceive; however, because of the inherent difficulties in proving intent, they may use circumstantial evidence, including evidence of the Debtor's conduct, to establish his intent.  *Buckeye Retirement Co., L.L.C. v. Heil (In re Heil)*, 289 B.R. 897, 907 (Bankr. E.D. Tenn. 2003) (citing *Sowers*, 229 B.R. at 157).  Harm suffered by the Plaintiffs is irrelevant for the purposes of § 727(a)(2)(A).  *Costello*, 299 B.R. at 894 (citing *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 968 (7th Cir. 1999)).

In order to determine actual intent, based upon circumstantial evidence, many courts consider the following "badges of fraud":

> (i) the lack of adequate consideration for the transfer; (ii) the family, friendship, or close relationship between the parties; (iii) the retention of possession, benefit, or use of the property in question by the debtor; (iv) the financial condition of the party sought to be charged prior to and after the transaction in question; (v) the conveyance of all of the debtor's property; (vi) the secrecy of the conveyance; (vii) the existence or cumulative effect of a pattern or series of transactions or course of conduct after incurring of debt,

onset of financial difficulties, or pendency or threat of suit by creditors; and (viii) the
general chronology of events and transactions under inquiry.

*Matus*, 303 B.R. at 672-73; *see also Stevenson v. Cutler (In re Cutler)*, 291 B.R. 718, 723 (Bankr. E.D. Mich.

2003); *Nashville City Bank & Trust Co. v. Peery (In re Peery)*, 40 B.R. 811, 815 (Bankr. M.D. Tenn. 1984).

Additional factors indicating a debtor's actual intent include

whether the transaction is conducted at arm's length; whether the debtor is aware of the
existence of a significant judgment or over-due debt; whether a creditor is in hot pursuit
of its judgment or claim and whether the debtor knows this; and the timing of the
transfer relative to the filing of the petition.

*Adamson v. Bernier (In re Bernier)*, 282 B.R. 773, 781 (Bankr. D. Del. 2002).  If the plaintiff establishes the

existence of badges of fraud, the burden shifts to the debtor to rebut the presumption.  *Village of San*

*Jose v. McWilliams*, 284 F.3d 785, 791 (7th Cir. 2002); *see also Peery*, 40 B.R. at 815 n.6.  Moreover "[j]ust

one wrongful act may be sufficient to show actual intent . . . [although] a continuing pattern of wrongful

behavior is a stronger indication [thereof]."  *Sowers*, 229 B.R. at 157.

The Plaintiffs aver that on April 21, 2003, approximately eight months before he filed for

Chapter 7, the Debtor, through Mountain Top Development, executed a Deed of Trust in the amount

of $125,000.00 in favor of Connie Susong, transferring Lot 21 of Dogwood Farms Subdivision, Phase

VI, Sevierville, Sevier County, Tennessee, thereby securing his repurchase of their former marital

residence, a debt he was required to pay pursuant to their Marital Dissolution Agreement.  *See* TRIAL

EX. 64.

The Plaintiffs also argue that the following transfers of property by Mountain Top Development

in the year preceding the Debtor's bankruptcy case evidence his intent to deceive and support a denial

of discharge under § 727(a)(2)(A).  On February 20, 2003, Mountain Top Development conveyed Lot

14 in Dogwood Farms, Phase VI, to Gerald L. Miller and Charles A. McGinnis for $90,000.00.  *See*

33

TRIAL EX. 72.  On May 22, 2003, Mountain Top Development conveyed Lots 34 and 35 in Dogwood

Farms, Phase VI, to Teddy and Kristy Jones and J.R. and Tammy Boling for $117,000.00.  *See* TRIAL

EX. 75.  Additionally, on April 21, 2003, Mountain Top Development conveyed approximately five

acres located on Wears Valley Road in Sevier County, Tennessee, to John and Marcia Hickman for

$165,000.00.  *See* TRIAL EX. 73.

The Debtor counters that he, personally, has not transferred or concealed any property within

the year preceding his bankruptcy filing.  Instead, he argues that Mountain Top Development is a

separate entity.  Under Tennessee law, "[a] corporation is presumptively treated as a distinct entity,

separate from its shareholders, officers, and directors."  *Oceanics Schs., Inc. v. Barbour*, 112 S.W.3d 135,

140 (Tenn. Ct. App. 2003); *see also Schlater v. Haynie*, 833 S.W.2d 919, 925 (Tenn. Ct. App. 1991).  "[T]he

fact that one owns all the stock of a corporation does not make him the owner of its property."  *Hinton

v. Carney*, 250 S.W.2d 364, 365 (Tenn. 1952).

Here, it is undisputed that Mountain Top Development was formed as a limited liability

company under the laws of the State of Tennessee on July 8, 2002, when its Articles of Incorporation

were recorded with the Tennessee Secretary of State.  *See* TRIAL EX. 95; TRIAL EX. 97.  The transfers

in question raised by the Plaintiffs are of property owned by Mountain Top Development.  The deeds

were executed by the Debtor in his capacity as "managing member" of Mountain Top Development.

As these transfers involved property of Mountain Top Development and not that of the Debtor, the

court finds that the Plaintiffs have not met their burden of proof under § 727(a)(2)(A).

**E**

34

The Plaintiffs also object to the Debtor's discharge under § 727(a)(2)(B). Whereas § 727(a)(2)(A) encompasses the Debtor's pre-petition acts, his post-petition actions fall within the scope of § 727(a)(2)(B), which requires proof that "(1) the debtor transferred or concealed property, (2) such property constituted property of the estate, (3) the transfer or concealment occurred after the filing of the bankruptcy petition, and (4) the transfer or concealment was made with the intent to defraud the bankruptcy trustee." *Sowers*, 229 B.R. at 156. Once a creditor establishes its case, the burden shifts to the debtor to provide the court with a convincing explanation for the concealment. *Royer v. Smith (In re Smith)*, 278 B.R. 253, 257 (Bankr. M.D. Ga. 2001). As with § 727(a)(2)(A), the Plaintiffs may establish the Debtor's intent under § 727(a)(2)(B) through evidence of his conduct. *Sowers*, 229 B.R. at 157. With respect to this subsection, the Plaintiffs argued that the Debtor did not disclose the May 18, 2004 transfer of Lot 5, Dogwood Farms, Phase VI, from Mountain Top Development to John and Christine Smilde for the purchase price of $57,998.75. *See* Trial Ex. 64.

Once again, however, the Plaintiffs have not offered sufficient proof that the Debtor should be denied his discharge pursuant to § 727(a)(2)(B). The owner of the property conveyed to the Smildes was not the Debtor, but Mountain Top Development, a limited liability company, separate and distinct from the Debtor. The real property in question was never property of the Debtor's bankruptcy estate, and thus, the post-petition transfer thereof does not implicate denial of his discharge under subsection (a)(2)(B).

## III

Because the Debtor will be denied his discharge generally under § 727(a)(3), (4)(A), and (5), it is not necessary for the court to address the Plaintiffs' § 523(a) nondischargeability action.

35

IV

Finally, the Plaintiffs seek a judgment against the Debtor in the amount of $329,283.66, plus treble damages for violating the Tennessee Consumer Protection Act, punitive damages, pre-judgment interest, attorneys' fees, and costs.  This requested $329,283.66 figure represents the $613,643.77 cost to complete the log home, less the $329,166.64 owed on the Contract and $10,000.00 received for the logs, resulting in $274,477.13, plus the following additional expenses: (1) $30,320.00 for costs of repairs; (2) $187.50 for the crane to remove the inadequate logs; (3) $285.00 in legal fees to remove McCarter Lumber Company's lien; (4) $953.00 for variance fees; (4) $282.00 to survey the variance; (5) $4,725.00 for an engineering report; (6) $2,275.00 to obtain extension builders risk insurance; and (7) $15,779.03 in interest on the Plaintiffs' construction loan.  *See* TRIAL EX. 49.[19]

As an initial matter, this court has previously held that the bankruptcy court possesses both the jurisdiction and the authority to adjudicate the Plaintiffs' claims and award any necessary damages, as measured by state law.  *See Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 759 (Bankr. E.D. Tenn. 2003) (citing *Longo v. McLaren (In re McLaren)*, 3 F.3d 958, 965 (6th Cir. 1993) (analyzing the question in connection with an action under § 523 and citing *N.I.S. Corp. v. Hallahan (In re Hallahan)*, 936 F.2d 1496, 1508 (7th Cir. 1991) (holding that "allowing the bankruptcy judge to settle both the dischargeability of the debt and the amount of the money judgment accords with the 'rule generally followed by courts of equity that having jurisdiction of the parties to controversies brought before them, they will decide all matters in dispute and decree complete relief.'") (quoting *Alexander v. Hillman*, 56 S. Ct. 204, 211 (1935));

---

[19] The Summary of Damages marked as Trial Exhibit 49 incorrectly shows the balance owed on the Back to Basics Contract as $229,166.64; however, based upon the proof presented, the actual balance owed by the Plaintiffs on this Contract was $329,166.64, representing the original purchase price of $531,442.00, minus the total draws by the Plaintiffs in the amount of $202,275.35.

36

*see also Barclays/Am. Bus. Credit, Inc. v. Adams (In re Adams)*, 31 F.3d 389 (6th Cir. 1994), *aff'g* 171 B.R. 298,

305 (W.D. Tenn. 1992) (finding that the bankruptcy court's denial of discharge under § 727(a)(2) and

imposition of monetary judgment award were warranted).

Although the issue of monetary damages more often arises in nondischargeability

determinations, a creditor may request both a denial of discharge and liquidation of its debt. *Structured*

*Asset Servs., LLC v. Self (In re Self)*, 325 B.R. 224, 252 (Bankr. N.D. Ill. 2005) (citing *Cohen v. de la Cruz*,

118 S. Ct. 1212 (1998) and *In re Bero*, 110 F.3d 462 (7th Cir. 1997)). The *Self* court chose not to enter a

monetary judgment for the following reasons:

> The Court declines to liquidate the Creditor's debt and enter a judgment in favor of the
> Creditor. The Court is unable to ascertain the exact amount due and owing the Creditor
> pursuant to the loan agreement. The complaint seeks the sum of $145,776.01, but at
> trial, Savysky, on behalf of the Creditor, testified that [the] amount due and owing the
> Creditor is approximately $198,000.00. The Creditor failed to adequately demonstrate
> at trial how those sums were calculated to establish the proper amount of its debt. As
> a result, the Court will not liquidate and reduce the Creditor's debt to a money
> judgment. The Creditor will have to seek the liquidation and collection of its debt
> against the Debtor in another forum.

*Self*, 325 B.R. at 252-53.

Such is not the case here. During the three-day trial of this adversary proceeding, the Plaintiffs

presented concrete evidence of their damages, leaving no speculation as to how they arrived at the

requested amounts. Requiring the parties to return to another court of law for the sole purpose of

liquidating damages would be a substantial waste of judicial economy, as well as a great expense to all

parties, who would be required to sit through another lengthy trial and incur additional attorneys' fees.

Accordingly, the court will liquidate the Plaintiffs' damages and enter a judgment based upon the record

before it.

**A**

37

This action centers around a breach of the Contract entered into between the parties on November 2, 1999. Under Tennessee law, "[t]he purpose of assessing damages in breach of contract cases is to place the plaintiff as nearly as possible in the same position [he] would have been in had the contract been performed, but the nonbreaching party is not to be put in any better position by recovery of damages for the breach of the contract than he would have been if the contract had been fully performed." *Cantrell v. Knox County Bd. of Educ.*, 53 S.W.3d 659, 662 (Tenn. 2001) (quoting *Lamons v. Chamberlain*, 909 S.W.2d 795, 801 (Tenn. Ct. App. 1993)). "Generally speaking, damages for breach of contract include only such as are incidental to or directly caused by the breach and may be reasonably supposed to have entered into the contemplation of the parties." *BVT Lebanon Shopping Ctr., Ltd. v. Wal-Mart Stores, Inc.*, 48 S.W.3d 132, 136 (Tenn. 2001) (quoting *Simmons v. O'Charley's, Inc.*, 914 S.W.2d 895, 903 (Tenn. Ct. App. 1995)). This "expectation interest" is "measured by (a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, less (c) any cost or other loss that he has avoided by not having to perform." *BVT Lebanon Shopping Ctr.*, 48 S.W.3d at 136 (citing RESTATEMENT (SECOND) OF CONTRACTS § 347 (1979)). Additionally, "[i]f the defects in workmanship are so substantial that the performance of the contract made by the defendant is worthless, the contractor must pay the other party the cost of having the job redone." *Wilhite v. Brownsville Concrete Co., Inc.*, 798 S.W.2d 772, 775 (Tenn. Ct. App. 1990).

The record clearly supports an award of consequential damages to the Plaintiffs based upon the Debtor's breach of contract. First, even though the November 2, 1999 Contract does not expressly

38

provide that the home would be finished in one year, that time-table was implied in the Debtor's

suggestion that the Plaintiffs obtain a one-year construction loan "due to the size of the house." TRIAL

EX. 28.  Furthermore, the Debtor admitted in his Answer that the parties orally agreed that the home

would be completed within one year.  *See* TRIAL EX. 2 at ¶ 4.  The Plaintiffs' construction loan closed

in March 2000, and the Debtor admittedly began construction in May 2000.  Nevertheless, at the time

the Plaintiffs directed the Debtor to cease construction in May 2001, very little work had actually taken

place on the home.

Second, as previously discussed in detail, there were extensive defects in the items constructed,

including severe problems with the house's foundation, which the evidence establishes was not properly

built or secured, nor was it properly covered from the elements to prevent damage and water buildup.

There is no question that the Plaintiffs could not have used the structure as it existed in May 2001, and

they were more than justified in both severing their relationship with the Debtor and finding another

builder to complete their home.  Additionally, based upon the severity of the defects, the Plaintiffs were

required to hire experts, such as Mr. Duncan and Mr. Howard, to fully identify and repair the damaged

structure prior to moving forward with the completion of their home.

Accordingly, the court finds that the Plaintiffs are entitled to **a judgment against the Debtor in**

**the amount of $329,283.66, representing their consequential damages stemming from his** breach of

contract and substantially defective workmanship.  This amount includes all costs that the Plaintiffs

expended to both repair the existing structure and to complete the home, which they testified was

slightly smaller and contained fewer amenities than the one promised by the Debtor, as well as all other

costs incidental to the breach, including removal of the logs from their property, fees to remove the

materialmen's lien placed upon their property, fees to survey and correct variance issues, the extended

builders risk insurance, and the interest that they incurred through the extension of their construction

loan with Waterfield Financial.

**B**

The Plaintiffs have also requested pre-judgment interest, which is governed by the following

statute:

> Prejudgment interest, i.e., interest as an element of, or in the nature of, damages as
> permitted by the statutory and common laws of the state as of April 1, 1979, may be
> awarded by courts or juries in accordance with the principles of equity at any rate not
> in excess of a maximum effective rate of ten percent (10%) per annum; provided, that
> with respect to contracts subject to § 47-14-103, the maximum effective rates of
> prejudgment interest so awarded shall be the same as set by that section for the
> particular category of transaction involved. In addition, contracts may expressly provide
> for the imposition of the same or a different rate of interest to be paid after breach or
> default within the limits set by § 47-14-103.

TENN. CODE ANN. § 47-14-123 (2001). It is within the sound discretion of the court whether to award

pre-judgment interest, depending on the circumstances of each particular case. *Myint v. Allstate Ins. Co.*,

970 S.W.2d 920, 927 (Tenn. 1999).

The purpose of awarding pre-judgment interest "is to fully compensate a plaintiff for the loss

of the use of funds, not to penalize a defendant." *Alexander v. Inman*, 974 S.W.2d 689, 698 (Tenn. 1998).

Equity is the guiding force in making a determination whether to award pre-judgment interest, but the

court should also consider whether "the amount of the obligation is certain, or can be ascertained by

a proper accounting, and [whether] the amount is not disputed on reasonable grounds." *Myint*, 970

S.W.2d at 927. Generally, "if the existence or amount of an obligation is certain, this fact will help

support an award of prejudgment interest as a matter of equity." *Myint*, 970 S.W.2d at 928. "There are,

however, circumstances which may make the award of prejudgment interest inappropriate, including

situations where 'the party seeking prejudgment interest has been . . . inexcusably dilatory in pursuing a claim [or] has unreasonably delayed the proceedings after suit was filed [or such party] has already been otherwise compensated for the lost time value of its money.'" *Gen. Constr. Contractors Ass'n, Inc. v. Greater St. Thomas Baptist Church*, 107 S.W.3d 513, 526 (Tenn. Ct. App. 2002) (quoting *Scholz v. S.B. Int'l, Inc.*, 40 S.W.3d 78, 83 (Tenn. Ct. App. 2000)).

Based upon the proof presented, the court finds that pre-judgment interest is appropriate in this case. The Plaintiffs were deprived of the use of an ascertainable amount of their funds, they did not delay in seeking to recover their losses from the Debtor, and they have not been otherwise compensated for the lost value of their money. When the Plaintiffs entered into the Contract with the Debtor, on November 2, 1999, they made an initial deposit of $5,000.00. Then, between March 2000 and November 2000, the Plaintiffs paid the Debtor $197,275.35 in draws for construction of the home. Of that amount, the Debtor produced invoices to evidence that, between March 7, 2000 and February 12, 2001, he actually paid $51,284.18 for work performed on the Plaintiffs' home. TRIAL EX. 51; TRIAL EX. 52. Accordingly, the Plaintiffs were deprived of $150,991.17 by the Debtor's failure to construct their home pursuant to the Contract, and the court finds that they are entitled to pre-judgment interest at a rate of 8.5% on that amount from February 13, 2001, the last date upon which any invoice was incurred or paid by the Debtor on behalf of the Plaintiffs' construction, through the date upon which this court's judgment is entered.[20]

## C

---

[20] The court finds that a proper measure for interest is the prime rate. In February 2001, the prime rate of interest was 8.5%. *See Prime Rate - Rate, Definition & Historical Graph, at* http://www.nfsn.com/library/prime.htm.

In addition to consequential damages, the Plaintiffs also seek an award of punitive damages. "The purpose of punitive damages is not to compensate the plaintiff but to punish the wrongdoer and to deter others from committing similar wrongs in the future." *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 906-07 (Tenn. 1999). Under Tennessee law, punitive damages may be assessed only in cases where "a defendant has acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992).

> A person acts intentionally when it is the person's conscious objective or desire to engage in the conduct or cause the result. A person acts fraudulently when (1) the person intentionally misrepresents an existing, material fact or produces a false impression, in order to mislead another or to obtain an undue advantage, and (2) another is injured because of reasonable reliance upon that representation. A person acts maliciously when the person is motivated by ill will, hatred, or personal spite. A person acts recklessly when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances.

*Hodges*, 833 S.W.2d at 901 (citations omitted). Because punitive damages are warranted in only the most egregious of cases, and "[t]o accomplish the twin purposes of punishment and deterrence," a defendant's intentional, fraudulent, malicious, or reckless conduct must be proved by clear and convincing evidence. *Metcalfe v. Waters*, 970 S.W.2d 448, 451 (Tenn. 1998); *Hodges*, 833 S.W.2d at 901.

The Plaintiffs both testified that during the year in which he was to be building their home, the Debtor consistently misrepresented the status thereof. At the Debtor's request, in March 2000, immediately following closing of their construction loan, the Plaintiffs directed Waterfield Financial to deposit $153,632.95 in order to purchase the log home package; however, the Debtor did not receive any of the timbers until April 5, 2002. Between those dates, the Debtor offered problems getting the

logs to his mill in North Carolina,[21] a broken planer, the Christmas holidays, and bad weather as the
reasons for the delay.  Additionally, the Plaintiffs stated that the large timber beams necessary to
construct their home were never delivered to their property.

They also proved that between March 13, 2000 and May 2, 2000, the Debtor and Back to Basics,
together with Connie Susong,[22] withdrew money from the Construction Account and used it for
purposes other than purchasing their log package or constructing their home.  Between March and May
2000, funds were transferred from the Construction Account to the general account for Back to Basics
as follows:  a total of $100,000.00 in March, a total of $33,000.00 in April, and a total of $23,000.00 in
May.  *See* TRIAL EX. 56.  On March 27, 2000, $50,000.00 of the $100,000.00 transferred to the Back to
Basics general account was paid to McCarter Lumber and applied to its account, with the oldest invoices

---

[21] During this time period, the Plaintiffs repeatedly asked the Debtor to divulge the name of his log supplier;
however, he refused to do so.  His refusal has carried through the State Court Lawsuit and the litigation of this adversary
proceeding.  At trial, when asked why he would not disclose the identify of this supplier, the Debtor defiantly stated that it
was no one's business who he used to supply his logs.

[22] The Debtor testified that it was his wife, Connie, who did all of the bookkeeping and paid all of the bills, and,
in fact, the trial exhibits evidence that Connie signed the checks for Back to Basics.  *See* TRIAL EX. 50; TRIAL EX. 56.
Nevertheless, based upon the evidence, the court easily infers a business partnership between the Debtor and Ms. Susong.

Under Tennessee law, the partnership status is created by either an express or implied contract of partnership, but
there is no requirement that the parties actually intended to become partners.  *Bass v. Bass*, 814 S.W.2d 38, 41 (Tenn. 1991).
When there is no written contract, the intent to form a partnership may be derived from the parties' actions.  *Wyatt v. Brown*,
281 S.W.2d 64, 67 (Tenn. Ct. App. 1955).  When determining whether a partnership exists, courts will consider the totality
of all relevant facts and circumstances "where it appears that the individuals involved have entered into a business
relationship for profit, combining their property, labor, skill, experience, or money."  *Pettes v. Yukon*, 912 S.W.2d 709, 715
(Tenn. Ct. App. 1995) (quoting *Bass*, 814 S.W.2d at 41).  "It is not necessary that the parties intend to actually form a
partnership or even that they know the legal result of their actions is to create a partnership."  *Messer Griesheim Indus., Inc. v.
Cryotech of Kingsport, Inc.*, 45 S.W.3d 588, 605 (Tenn. Ct. App. 2001).  The pooling of "money, assets, labor, or skill . . . [results
in] a partnership whether or not the parties understood that it would be so."  *Bass*, 814 S.W.2d at 41 (citing *Pritchett v. Thomas
Plater & Co.*, 232 S.W. 961, 969-70 (1921)).

In this case, there is no dispute that the Debtor and Ms. Susong shared in the profits of Back to Basics.
Furthermore, the Debtor acknowledged at trial that Ms. Susong often signed his name to documents, with his express
authorization to do so, and that he voluntarily left the bookkeeping and bill-paying to her.  Any actions taken by Ms. Susong
with respect to the Back to Basics bank accounts was fully endorsed by the Debtor, as if he had personally acted himself.

43

paid first. *See* TRIAL EX. 24. When construction on the Plaintiffs' home actually commenced in May 2000, the Construction Account had a balance of only $819.95. Thereafter, in November 2000, the Plaintiffs authorized another draw of $43,642.40, bringing the grand total of monies deposited into the Construction Account to $202,275.35. However, as previously discussed, the Debtor only expended $51,284.18 towards construction of the Plaintiffs' home.

The Plaintiffs have also argued that, under Tennessee law, the Debtor's use of the money from their Construction Account for purposes other than the construction of their home constituted actual fraud, pursuant to the following statute:

> Such use of the proceeds enumerating in § § 66-11-137 – 66-11-139 for any purpose other than either payment pursuant to written agreement between the parties or in accordance with the allocation of costs and profits under generally accepted accounting principles for construction projects shall be prima facie evidence of intent to defraud. Use of a single business bank account for multiple projects shall not be evidence of intent to defraud.

TENN. CODE ANN. § 66-11-140 (2004).[23]

---

[23] As it relates to this case, this statute implicates part 138, which states as follows:

(a) Any contractor, subcontractor, or other person who, with intent to defraud, uses the proceeds of any payment made to that person on account of improving certain real property for any other purpose than to pay for labor performed on, or materials furnished by that person's order for, this specific improvement, while any amount for which such person may be or become liable for such labor or materials remains unpaid, commits a Class E felony.

(b) Notwithstanding the provisions of subsection (a), there is no violation of this section when:

(1) Funds are disbursed pursuant to written agreement; or

(2) The use of funds received and deposited in a business account for use on multiple construction projects is based upon the allocation of costs and profits in accordance with generally accepted accounting principles for construction purposes.

TENN. CODE ANN. § 66-11-138 (2004).

The Plaintiffs were required to prove by clear and convincing evidence that punitive damages are warranted. However, based upon the evidence presented and its interpretation of section 66-11-138 and -140, the court does not find that the Debtor acted with an intent to defraud when he, and Back to Basics, used funds from the Plaintiffs' Construction Account for other purposes than the construction of their home.

A review of the bank records for Back to Basics evidences that the Debtor co-mingled funds from many construction accounts into the general account for Back to Basics, from which the bills were then paid. At trial, the Debtor acknowledged this practice, explaining, to the court's satisfaction, that it was easier to write checks to suppliers and sub-contractors out of the general account than to write several checks out of several construction accounts. *See* TRIAL EX. 56. Additionally, under section 66-11-140, the Debtor's use of a single, general account to pay expenses and bills from multiple construction projects cannot be considered evidence of his intent to defraud, and the Plaintiffs offered no evidence that this practice violated "generally accepted accounting principles for construction purposes," TENN. CODE ANN. § 66-11-138(b)(2); -140. While the Debtor's actions and inactions with respect to the handling of the Back to Basics bank accounts, and primarily the Plaintiffs' Construction Account, may have been negligent, the court is not convinced that those actions and inactions rise to the level of fraudulent or malicious, as required for imposition of punitive damages.[24]

**D**

---

[24] Moreover, the court does not believe that the Debtor needs further "punishment." In the court's opinion, denial of his discharge, along with the assessment of a substantial judgment in favor of the Plaintiffs against him, is punishment enough.

The Plaintiffs have also requested their attorneys' fees in the amount of $126,555.73.  "In Tennessee, courts follow the American Rule, which provides that litigants must pay their own attorney's fees unless there is a statute or contractual provision providing otherwise." *Taylor v. Fezell*, 158 S.W.3d 352, 359 (Tenn. 2005).  Here, the Contract expressly provides that if the purchasers, i.e., the Plaintiffs, did not pay all invoices as required, they would be liable for attorneys' fees related to the collection of such past due amounts.  *See* TRIAL EX. 3.  However, there are no provisions concerning liability for attorneys' fees in any other scenario arising under the Contract.

Nevertheless, the Plaintiffs may recover attorneys' fees if the court finds that the Debtor violated the Tennessee Consumer Protection Act (TCPA).  The purposes of the TCPA are set forth in Tennessee Code Annotated section 47-18-102, as follows:

> The provisions of this part shall be liberally construed to promote the following policies:
>
> (1) To simplify, clarify, and modernize state law governing the protection of the consuming public and to conform these laws with existing consumer protection policies;
>
> (2) To protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within this state;
>
> (3) To encourage and promote the development of fair consumer practices;
>
> (4) To declare and provide for civil legal means for maintaining ethical standards of dealing between persons engaged in business and the consuming public to the end that good faith dealings between buyers and sellers at all levels of commerce be had in this state; and
>
> (5) To promote statewide consumer education.

TENN. CODE ANN. § 47-18-102 (2001).  "The TCPA generally applies to transactions between buyers and sellers, and its purpose is to protect buyers in such transactions from unfair and deceptive practices in the conduct of commerce." *Sherwood v. Microsoft Corp.*, No. M2000-01850-COA-R9-CV, 2003 Tenn. App. LEXIS 539, at *111, 2003 WL 21780975, at *32 (Tenn. Ct. App. July 31, 2003) (citations omitted).

46

The TCPA covers "[t]rade," "commerce," or "consumer transaction[s]," which are collectively defined as "the advertising, offering for sale, lease or rental, or distribution of any goods, services, or property, tangible or intangible, real, personal, or mixed, and other articles, commodities, or things of value wherever situated[.]" TENN. CODE ANN. § 47-18-103(11) (2001). It prohibits all persons engaged in the aforementioned "trade or commerce" from "[e]ngaging in any . . . act or practice which is deceptive to the consumer or to any other person." TENN. CODE ANN. § 47-18-104(b)(27) (2001 & Supp. 2004). The TCPA also creates a private right of action for "[a]ny person who suffers an ascertainable loss of money or property, real, personal, or mixed, . . . as a result of the use or employment by another person of an unfair or deceptive act or practice" to recover actual damages, including attorneys' fees. TENN. CODE ANN. § 47-18-109(e)(1) (2001). "**The potential award of attorney's fees under the Tennessee Consumer Protection Act is intended to make prosecution of such claims economically viable to plaintiff.**" *Killingsworth v. Ted Russell Ford, Inc.,* 104 S.W.3d 530, 535 (Tenn. Ct. App. 2002) (citations omitted).

In this case, it is undisputed that the Debtor's businesses fell within the scope of the TCPA's definition of "trade, commerce, or consumer transactions," as he offered both goods and services to the Plaintiffs, in the form of building their log home. The issue remains, however, as to whether the Debtor engaged in conduct that was unfair or deceptive. These terms are not defined in the TCPA, and therefore, whether a defendant's actions are unfair or deceptive must be determined on a case by case basis. *Ganzevoort v. Russell*, No. 01S01-9602-CV-00040, 1997 Tenn. LEXIS 406, at *1-2 (Tenn. Aug. 25, 1997). Nevertheless, the TCPA "shall be interpreted and construed consistently with the interpretations given by the federal trade commission and the federal courts pursuant to § 5(A)(1) of the Federal Trade Commission Act (15 U.S.C. § 45(a)(1)). TENN. CODE ANN. § 47-18-115 (2001).

47

Accordingly, the Tennessee Court of Appeals has held the following with respect to the

definitions of unfair and deceptive under the TCPA:

> The concept of deceptiveness is a broader, more flexible standard of actionable
> merchant misconduct than the traditional remedy of common-law fraud.  A deceptive
> act or practice is one that causes or tends to cause a consumer to believe what is false
> or that misleads or tends to mislead a consumer as to a matter of fact.  Thus, for the
> purposes of the [various Consumer Protection Acts], the essence of deception is
> misleading consumers by a merchant's statements, silence, or actions.
>
> The concept of unfairness is even broader than the concept of deceptiveness, and it
> applies to various abusive business practices that are not necessarily deceptive.  In the
> 1994 legislation reauthorizing the Federal Trade Commission, Congress undertook to
> codify the Commission's policy statement on unfairness by stating that an act or practice
> should not be deemed unfair "unless the act or practice causes or is likely to cause
> substantial injury to consumers which is not reasonably avoidable by consumers
> themselves and not outweighed by countervailing benefits to consumers or to
> competition."  15 U.S.C.A. § 45(n).  Following the mandate of Tenn. Code Ann. § 47-
> 18-115, we will use this description of unfairness to guide our interpretation of Tenn.
> Code Ann. § 47-18-104(a).

*Tucker v. Sierra Builders*, No. M2003-02372-COA-R3-CV, 2005 Tenn. App. LEXIS 261, at *15-17, 2005

WL 1021675, at *4-5 (Tenn. Ct. App. Apr. 29, 2005) (footnotes and citations omitted).  The court

further stated that

> To be considered "substantial," consumer injury must be more than trivial or
> speculative.  Substantial injury usually involves monetary injury or unwarranted health
> and safety risks.  Consumer injury will be considered substantial if a relatively small
> harm is inflicted on a large number of consumers or if a greater harm is inflicted on a
> relatively small number of consumers.
>
> Even if an act or practice causes or is likely to cause substantial injury, it will not be
> considered unfair unless the injury is not reasonably avoidable by consumers themselves.
> Consumers cannot reasonably avoid injury when a merchant's sales practices
> unreasonably create or take advantage of an obstacle to the free exercise of consumer
> decision-making.  Practices that unreasonably interfere with consumer decision-making
> include (1) withholding important information from consumers, (2) overt coercion, or
> (3) exercising undue influence over a highly susceptible class of consumers.

*Tucker*, 2005 Tenn. App. LEXIS 261, at *17-18, 2005 WL 1021675, at *5 (citations omitted).

48

Although "[a] breach of contract or warranty is not in and of itself a deception, misrepresentation or unfairness under the [TCPA]," the facts upon which a breach of contract occurred can also serve as the basis for finding a violation. *Office Furniture & Related Servs., Inc. v. United Constr. Corp.*, No. M2003-02126-COA-R3-CV, 2005 Tenn. App. LEXIS 99, at *14, 2005 WL 378707, at *5 (Tenn. Ct. App. Feb. 16, 2005). In this case, the court believes that the Debtor's representations to the Plaintiffs about the structure that he was building concerning the type of logs and steel used, combined with his silence with respect to the obvious safety defects evident in the structure that he built, were deceptive and unfair, thus violating the TCPA.

As previously stated, deceptive acts lead a consumer to believe falsities. The record is replete with instances where the Debtor misled the Plaintiffs with respect to the construction of their home. First, the Debtor misrepresented that he was purchasing the log package in March 2000, when, in fact, he did not purchase the log package until sometime in the early part of 2001. Furthermore, when the Plaintiffs questioned him about the whereabouts of the logs, the Debtor consistently gave excuses as to why they were not being delivered, ranging from travel issues from North Carolina, a broken planer, and closing for the holidays, and he refused on every occasion when asked to disclose the name of his supplier.

Second, the logs that the Debtor did supply were not sufficient to build the home pursuant to the Contract. Mr. Webb testified that the logs were not graded and that some were damaged from being exposed to the elements. He also questioned whether the Eastern White Pine logs used by the Debtor were strong enough to support the structural requirements of a home that size. Additionally, none of the logs for the second floor or the roof, the porch beams, the structural beams, or the stairs were present on the Plaintiffs' property, despite the fact that the Debtor represented to the Plaintiffs that all

49

of the logs from the package necessary to build the home were delivered, and the Back to Basics invoice evidenced that all logs were delivered.  *See* TRIAL EX. 27.

Third, the Debtor represented to the Plaintiffs, and he argued at trial, that the entire basement wall was reinforced with adequate steel beams.  Nevertheless, based upon the testimony of Mr. Duncan, a structural engineer, and evidenced by the various photographs introduced into evidence, it is apparent that the Debtor failed to properly reinforce the foundation with adequate steel, resulting in movement of nearly one inch and cracking.  *See, e.g.,* TRIAL EX. 7; TRIAL EX. 8.  Mr. Duncan testified that only the part of the wall nearest the garage had steel reinforcements, which themselves were not strong enough, and that if steel had been installed in the initial pouring of the foundation concrete, the steel would still be sticking up.  Additionally, although the Debtor testified that he used one-half inch steel, the Plaintiffs introduced into evidence an invoice from McCarter Lumber in May 2000, referencing the Plaintiffs' Lot 1, where the Debtor purchased three-eighths inch steel.  *See* TRIAL EX. 21.

Based upon these misrepresentations, the court finds that the Debtor violated Tennessee Code Annotated section 47-18-104(b)(27) by engaging in an act that was deceptive with respect to the Plaintiffs.  Accordingly, the court finds that it is appropriate to award to the Plaintiffs reasonable attorneys' fees associated with their action against the Debtor.  Additionally, the court agrees that, based upon the lengths to which the Plaintiffs have been required to go in order to finally adjudicate their claims against the Debtor, starting with the State Court Lawsuit and culminating in this adversary proceeding, along with the various discovery disputes and the three day trial associated therewith, the fees charged by the Plaintiffs' attorneys were reasonable.[25]  Accordingly, the court will award the

---

[25] Under Tennessee law, the appropriate factors to be used in determining whether attorneys' fees are reasonable are as follows:

(continued...)

Plaintiffs their attorneys' fees, in the total amount of $126,555.73, pursuant to Tennessee Code Annotated section 47-18-109(e)(1).

### E

Finally, the Plaintiffs have requested treble damages under the TCPA. Only if a court finds that a violation of the TCPA was willful or knowing, "may [it] award three (3) times the actual damages sustained[.]" TENN. CODE ANN. § 47-18-109(a)(3) (2001).[26] However, because treble damages are punitive in nature, it is within the discretion of the court to determine if they are appropriate, *see Elliott v. Mahaffey*, No. 01-A-01-9110-CV-00379, 1992 Tenn. App. LEXIS 376, at *6, 1992 WL 87331, at *3 (Tenn. Ct. App. May 1, 1992), as "the statute does not mandate an award of treble damages upon a finding of willful or knowing violation." *Keith v. Howerton*, ___ S.W.3d ___, No. E2003-02210-COA-R3-CV, 2004 Tenn. App. LEXIS 705, at *3, 2004 WL 2412615, at *1 (Tenn. Ct. App. Oct. 28, 2004).

As previously stated, the court believes that the Debtor's action rise to the level of negligence; however, he does not require any additional punishment beyond that which has already been assessed against him. Accordingly, the court declines to award treble damages under the TCPA.

---

[25](...continued)
(1) the time devoted to performing the legal service; (2) the time limitations imposed by the circumstances; (3) the novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly; (4) the fee customarily charged in the locality for similar legal services; (5) the amount involved and the results obtained; and (6) the experience, repututation, and ability of the lawyer performing the legal service.

*Connors v. Connors*, 594 S.W.2d 672, 676 (Tenn. 1980). Based upon the events of this adversary proceeding and the obvious time expended to prepare for and try this matter, the court finds that each of these factors has been satisfied with respect to the Plaintiffs' attorneys.

[26] Under the TCPA, "knowing" is defined as "actual awareness of the falsity or deception [that] may be inferred where objection manifestations indicate that a reasonable person would have known or would have had reason to know of the falsity or deception[.]" TENN. CODE ANN. § 47-18-103(6) (2001).

# IV

In summary, the court finds that the Debtor (1) made false statements under oath by providing false and incomplete information in his bankruptcy statements and schedules and failing to disclose income received from Mountain Top Development and Only Specs, with an intent to deceive his creditors; (2) failed to maintain or produce sufficient documentation through which his creditors could ascertain his financial condition, without adequate explanation for such failure; and (3) failed to adequately account for the disposition of income received from Mountain Top Development and Only Specs. Based upon these findings, the court holds that the Debtor shall be denied his discharge pursuant to 11 U.S.C.A. § 727(a)(2)(4)(A), (a)(3), and (a)(5). Furthermore, based upon the evidence presented, the Plaintiffs are entitled to consequential damages in the amount of $329,283.66, attorneys' fees in the amount of $126,555.73, and pre-judgment interest of $56,998.09,[27] resulting in a final judgment against the Debtor in the amount of $512,837.48. Finally, pursuant to Rule 7054(b) of the Federal Rules of Bankruptcy Procedure, the court will allow the Plaintiffs to recover their costs in prosecuting this adversary proceeding.

A judgment consistent with this Memorandum will be entered.

FILED: July 22, 2005

BY THE COURT

*/s/ RICHARD STAIR, JR.*

RICHARD STAIR, JR.
UNITED STATES BANKRUPTCY JUDGE

---

[27] This amount was calculated by figuring 8.5% interest for 1,621 days (from February 13, 2001, through and including July 22, 2005) on the $150,991.17 previously determined as the amount of money that the Plaintiffs were deprived the use of due to the Debtor's breach of contract.